# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John F. Grady | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 4949 | **DATE** | March 15, 2004 |
| **CASE TITLE** | **Newsub Magazine v. Heartland Direct** | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]
    Plaintiffs' motion for summary judgment as to liability on Counts I and II of the complaint [301-] is granted as to Count I and denied as to Count II as moot.
    Plaintiffs' motion for summary judgment on defendant's counterclaim [32-1] is granted in part, as to Counts I and II of the counterclaim. Count III of the counterclaim is dismissed with prejudice. ENTER MEMORANDUM OPINION.
    This case is set for a status conference on March 31, 2004, at 11:00 a.m.

(11) x [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | | | | **Document Number** |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | |
| | No notices required. | | number of notices | | |
| x | Notices MAILED by judge's staff. | | | | |
| | Notified counsel by telephone. | | date docketed | | 55 |
| | Docketing to mail notices. | | docketing deputy initials | | |
| | Mail AO 450 form. | | | | |
| | Copy to _____ | | date mailed notice | | |
| KAM | courtroom deputy's initials | | KAM | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

(Reserved for use by the Court)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

NEWSUB MAGAZINE SERVICES LLC and  )
GIFT SERVICES, LLC,                )
                                   )
        Plaintiffs/Counter-Defendants, )
                                   )
    v.                             )        No. 02 C 4949
                                   )
HEARTLAND DIRECT, INC.,            )
                                   )
        Defendant/Counter-Plaintiff. )

**MEMORANDUM OPINION**

Before the court are plaintiffs/counter-defendants' motions for summary judgment. For the reasons stated below, the motion for summary judgment as to liability on Counts I and II of plaintiffs' complaint is granted as to Count I and denied as to Count II, and the motion for summary judgment on defendant/counter-plaintiff's counterclaim is granted in part.

**BACKGROUND**

This is a diversity action for breach of contract. Plaintiffs Newsub Magazine Services LLC ("Newsub") and Gift Services, LLC ("Gift Services") market and sell magazine subscriptions and merchandise, respectively, through "inserts" included in credit card statements. Chevron Products Company ("Chevron"), which is not a party to this action, allows third parties such as Newsub and Gift Services to market their products to Chevron's credit card

holders through the placement of these inserts in Chevron credit card statements. Chevron receives a commission from these third parties. Defendant Heartland Direct, Inc. ("Heartland") acted as a middleman between plaintiffs and Chevron (for which Heartland also received a commission). Heartland obtained "slots" for bill inserts from Chevron for plaintiffs, and it received from Chevron and forwarded to plaintiffs proceeds from the sale of merchandise to credit card customers, less Chevron's and Heartland's commissions.[1]

This action arises out of Heartland's alleged failure to turn over to plaintiffs approximately $900,000 in sale proceeds that Chevron remitted to Heartland. Plaintiffs claim that this failure constituted a breach of an oral agreement between plaintiffs and Heartland (Count I). In the alternative, plaintiffs bring an unjust enrichment claim (Count II). Count III of the complaint is a conversion claim.

Heartland had a contract with Chevron (the "Heartland/Chevron Agreement") to act as a middleman with regard to credit card statement inserts. According to Heartland, plaintiffs interfered with this contract by inducing Chevron to deal directly with plaintiffs and cut out Heartland. Heartland has filed a three-count counterclaim alleging tortious interference with contract

---

[1] The intricate details of how merchandise orders were processed are unimportant for purposes of this motion.

(Count I) and tortious interference with prospective economic advantage (Count II). Count III of the counterclaim seeks a declaratory judgment of "the rights and obligations of the parties pursuant to the various agreements entered into by the parties," "the extent of entitlement to the funds in question," and "the liabilities of the parties under any agreements that may exist." (Answer/Counterclaim at 21.)

Plaintiffs now move for summary judgment as to liability on Counts I and II of the complaint and for summary judgment on Heartland's counterclaim.

## DISCUSSION

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. See Pitasi v. Gartner Group, Inc., 184 F.3d 709, 714 (7th Cir. 1999). "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Talanda v. KFC Nat'l Mgmt. Co., 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986)). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." McGrath v. Gillis, 44 F.3d 567, 569 (7th Cir. 1995).

## A. Plaintiffs' Motion for Summary Judgment as to Liability on Counts I and II of Plaintiffs' Complaint

Plaintiffs contend that they are entitled to summary judgment as to Heartland's liability on Count I of the complaint, which alleges breach of contract. To prove a claim for breach of contract under Illinois law, a plaintiff must show the existence of a contract, that plaintiff substantially performed its obligations under the contract, that defendant breached the contract, and that plaintiff suffered damage as a result. See Klem v. Mann, 665 N.E.2d 514, 518 (Ill. App. Ct. 1996).

### 1. Existence of a Contract

The parties first came in contact with each other some time in early or mid-1999. They never executed a written contract. Instead, plaintiffs submit evidence of an oral agreement that the parties would participate together in credit card insert promotions in the following way. Heartland, by virtue of its agreement with Chevron, was permitted to bid on "slots," which were spaces in Chevron's monthly credit card bills for advertising inserts. If plaintiffs wanted slots for a given promotion, they would inform

Heartland, which would reserve the slots. Plaintiffs were responsible for timely providing the inserts, providing the merchandise being advertised in the inserts, paying the sales taxes, and handling customer service. Credit card holders who ordered plaintiffs' merchandise would pay Chevron. Heartland was responsible to be the conduit through which Chevron transferred to plaintiffs their sales proceeds (less Chevron's commission). For its services as middleman, Heartland received a commission of $2.00 per 1000 inserts. (Plaintiffs' Local Rule 56.1 Statement, Ex. 1, Affidavit of Laurence Sheinman; Ex. 2, Transcript of Deposition of Charles Rey.)

Heartland does not dispute these mechanics of the parties' relationship. However, Heartland insists that there was no "formal" agreement, but merely what it deems a "'Let's Get the Business Done' transaction." (Defendant's Local Rule 56.1 Response, ¶ 22.) Whether the agreement can be deemed "formal" is neither here nor there; the issues are simply whether there was an agreement and if so, whether one of the agreed-upon terms was Heartland's responsibility for transferring the money it received from Chevron to plaintiffs, less commissions.

Heartland's position is belied by the testimony of its president, Charles Rey, that plaintiffs and Heartland agreed that they would conduct business together in the manner outlined _supra_.

(Plaintiffs' Local Rule 56.1 Statement, Ex. 2, at 60-76.)[2]
Heartland also explicitly states repeatedly in its Counterclaim
that there was an agreement between the parties and describes what
Heartland alleges were the terms:

> 10. Because Counter-Defendants did not have a marketing
> agreement with Chevron in the first quarter of 1999,
> Heartland and Counter-Defendants entered into an
> agreement whereby Heartland agreed to solicit mailing
> slots from Chevron for Counter-Defendants so that
> Counter-Defendants would be able to sell its [sic]
> products through Chevron.
> 11.  The agreements between Heartland and Counter-
> Defendants allowed Counter-Defendants to do business with
> Chevron and specified that Heartland was the seller.
> Chevron would then forward the proceeds from those sales
> to Heartland minus Chevron's commission pursuant to the
> [Heartland/Chevron Agreement].
> 12.  In accordance with the agreement between the parties
> and [the Heartland/Chevron Agreement], Counter-Defendants
> periodically printed and sent Inserts, previously
> approved by Chevron, to Chevron's "insertion facility."
> At this facility, Chevron assembled its customer billing
> statements with Counter-Defendants' Inserts.

(Answer/Counterclaim at 16-17.)   Heartland wholly fails to
acknowledge its prior position or to explain why it is now taking
a contrary position.  Moreover, Heartland submits no evidence of
its own and points to none of plaintiffs' evidence that creates a
genuine issue as to the existence of an agreement between the
parties, or that creates a genuine issue as to whether the parties
agreed that Heartland would forward to plaintiffs sale proceeds
received from Chevron.

---

[2] Mr. Rey was deposed both in his individual capacity and as Heartland's
Rule 30(b)(6) witness. (Plaintiffs' Local Rule 56.1 Statement at 2 n.2.)

Heartland raises a statute of frauds defense, asserting that there is no enforceable oral agreement due to failure to satisfy the general Illinois Statute of Frauds, 740 ILCS 80/1 et seq., and the UCC Statute of Frauds, 810 ILCS 5/2-201. This argument contradicts Heartland's prior position as well, but in any event, it fails on the merits. Heartland first suggests that the UCC Statute of Frauds applies because any agreement between it and plaintiffs was for the sale of goods. It relies on the provision of the Heartland/Chevron Agreement that "[t]itle to merchandise [sold in a promotion] shall be vested in" Heartland. (Plaintiffs' Local Rule 56.1 Statement, Ex. 5, Heartland/Chevron Agreement, at 2.) Heartland also argues that the general statute of frauds applies because any agreement with plaintiffs could not be performed within one year.

Heartland's contentions are based on the dubious and unsupported proposition that the Heartland/Chevron Agreement was incorporated into the agreement between plaintiffs and Heartland. Even assuming that Heartland took title to the merchandise pursuant to the agreement between Heartland and plaintiffs, that does not render the agreement one for the sale of goods. The proper analysis asks whether the predominant purpose of the agreement was for the sale of goods or non-goods; if it is for non-goods, the UCC Statute of Frauds does not apply. See Midwest Mfg. Holding, L.L.C. v. Donnelly Corp., 975 F. Supp. 1061, 1067 (N.D. Ill. 1997)

(applying Illinois law). The evidence here shows that the predominant purpose of the agreement was for the sale of non-goods, that is, for the broker/middleman services of Heartland in obtaining credit card insert slots. Accordingly, the UCC Statute of Frauds is inapplicable.[3]

The general Illinois Statute of Frauds also does not apply. Heartland asserts that even though each discrete insert promotion lasted only four months, "the requirements of the parties under the Heartland/Chevron Agreement lasted much longer." (Response at 8.) This argument is unavailing because it does not bear on the question of whether the <u>agreement between Heartland and plaintiffs</u> could have been performed within one year, and Heartland does not argue, nor does it submit any evidence, that <u>that</u> agreement could not have been performed within one year.

## 2. **Plaintiffs' Substantial Performance**

Although Heartland's argument is difficult to follow,[4] Heartland seems to suggest that plaintiffs did not fully perform their contractual duties and breached any agreement by eventually asking Chevron to pay sales proceeds directly to plaintiffs and not

---

[3] Taking the analysis one step further, even if the contract could be construed as one for the sale of goods, the UCC Statute of Frauds would not be applicable. An unwritten contract for the sale of goods of $500 or more is enforceable "if the party against whom enforcement is sought admits . . . that a contract for sale was made." 810 ILCS 5/2-201(3)(b). As described above, Mr. Rey admitted in his deposition that plaintiffs and Heartland entered into an agreement.

[4] In addition, Heartland's response is devoid of any authority to support its arguments other than that cited for general principles of law.

through Heartland. (Heartland admits that plaintiffs performed their contractual duties in all other respects.)

Plaintiffs contend that Heartland has waived this argument because it did not raise this alleged nonperformance/breach of contract in its answer as an affirmative defense, which Heartland was required to do by Federal Rule of Civil Procedure 8(c). We agree.[5] Heartland's answer also did not comply with Federal Rule of Civil Procedure 9(c), which requires a specific and particular denial of performance of conditions precedent. Heartland, accordingly, has waived any nonperformance defense. See Carroll v. Acme-Cleveland Corp., 955 F.2d 1107, 1115 (7th Cir. 1992).

Even if Heartland had not waived the defense, its argument is tellingly halfhearted and undeveloped. Heartland fails to explain in even a basic fashion how plaintiffs' request that Chevron pay them directly constituted a breach of the agreement between plaintiffs and Heartland.

### 3. Breach and Resulting Damage

Plaintiffs submit evidence that Heartland owes plaintiffs approximately $900,000 of sales proceeds that Heartland failed to turn over. (Plaintiffs' Local Rule 56.1 Statement, Ex. 2, Transcript of Deposition of Charles Rey, at 160-61, 168-69.)

---

[5] Heartland did raise a different failure-to-perform defense as an alternative to their estoppel defense, both of which we address infra, regarding plaintiffs' purported obligation to "secure a release of all claims as a condition precedent to disbursement of funds from Heartland." (Answer/Counterclaim at 9.)

Heartland concedes that it "refus[ed] to turn over the $900,000 it [] received from Chevron" (Response at 7), but asserts that "Plaintiffs' interference with Heartland's contract with Chevron . . . caused Heartland to lose millions of dollars in profits that far exceed any claim" by plaintiffs (Defendant's Local Rule 56.1 Response, ¶ 40). As we stated previously in our Minute Order of November 12, 2003, however, defendant's damages on its counterclaim are not material to the question of defendant's liability on plaintiffs' claims. There is no genuine issue that Heartland failed to turn over substantial sales proceeds to which plaintiffs were entitled.

### 4. Heartland's Estoppel Defense/Release of Liability

Heartland raises what it deems an "estoppel" defense. Its theory is as follows:

> **[Plaintiffs Are] Estopped From Requesting Payment Of The Chevron Promotion Funds Without Providing A General Release.**
>
> . . . [Plaintiffs] agreed to provide Heartland with a three way release of Heartland by [plaintiffs] and Chevron in exchange for the release of any amounts owed to [plaintiffs] by Heartland. [They] never provided this release and therefore no consideration was given to releasing the funds by Heartland.
>
> . . . [E]quitable estoppel applies if [plaintiffs] misrepresented or concealed material facts, [plaintiffs] knew that [their] misrepresentations were untrue when made and Heartland reasonably relied upon those misrepresentations in good faith to its detriment. . . . In this case, [plaintiffs] surreptitiously met with Chevron at some point between June and August, 2001 to negotiate [their] own deal for direct sales which would cut out Heartland. While this action, in and of itself, would certainly have been permissible if [plaintiffs] had

not already committed [themselves] to a promotion through Heartland because there was no contractual relationship between the parties, that action became improper and inequitable when [plaintiffs] went to Heartland to obtain and have Heartland bid and pay $145,000 to guarantee the October and November, 2001 Chevron slots for [plaintiffs'] products. [Plaintiffs] certainly knew that [they] intended to use Heartland as long as possible and then to divert the funds resulting from the October and November, 2001 promotions as [they] eventually attempted to do. Similarly, based upon the past dealings of the parties, Heartland was reasonable in its reliance on the fact that [plaintiffs] would not deal directly with Chevron or attempt to obtain the money directly. It was furthermore harmed as previously indicated by [plaintiffs] stopping the Chevron direct payments to [Heartland's bank].

(Response at 9-10 (citations omitted).)

This section of defendant's brief seems to encompass two separate arguments. The first is that plaintiffs cannot recover the monies that Heartland owes to them because they have not provided the release they allegedly promised. (Evidently, this release would pertain to liability for products returned to Chevron.) The second is that plaintiffs are equitably estopped from recovering the monies due to their efforts to "cut out" Heartland prior to using Heartland's services for a promotion. We will address each argument in turn.

The release argument fails for two reasons. Like many of Heartland's arguments, it is undeveloped, and Heartland does not provide or cite to any evidence that plaintiffs agreed to provide a release. More importantly, Heartland is incorrect as a matter of law. As plaintiffs point out, any promise by them to provide a

release in exchange for payment would constitute an unenforceable executory accord. "An 'executory accord' is an agreement to accept at some future time a stipulated performance as satisfaction of an obligation. . . . [A]n executory accord is unenforceable and will not bar enforcement of the original obligation unless: (1) the [promisee] has clearly accepted the new promise of future performance, itself, and not the ultimate performance of it, as satisfaction, and (2) the new promise is based upon new consideration." Collection Professionals, Inc. v. Logan, 695 N.E.2d 1344, 1348 (Ill. App. Ct. 1998). Here, any new promise to provide a release would not have been based upon new consideration because Heartland already owed the monies to plaintiffs pursuant to the original agreement and did not provide new consideration.

As for equitable estoppel, the evidence simply does not fit that defense. "The general rule is that where a person by his or her statements and conduct leads a party to do something that the party would not have done but for such statements and conduct, that person will not be allowed to deny his or her words or acts to the damage of the other party. Equitable estoppel may be defined as the effect of the person's conduct whereby the person is barred from asserting rights that might otherwise have existed against the other party who, in good faith, relied upon such conduct and has been thereby led to change his or her position for the worse." Geddes v. Mill Creek Country Club, Inc., 751 N.E.2d 1150, 1157

(Ill. 2001). Heartland asserts that plaintiffs improperly attempted to begin dealing with Chevron directly instead of through Heartland. There is no evidence of misrepresentations or conduct on plaintiffs' part of which Heartland was aware and relied on to its detriment, though.

In sum, Heartland has not come forward with evidence that would reasonably permit a jury to find in its favor regarding Heartland's liability on Count I. Summary judgment for plaintiffs as to Heartland's liability on Count I is therefore appropriate. (The damages issue remains.) Because Count II is pled in the alternative to Count I, summary judgment as to liability on Count II is denied as moot.

## B. Plaintiffs' Motion for Summary Judgment on the Counterclaim

Heartland alleges tortious interference with contract (Count I) and tortious interference with prospective economic advantage (Count II), and it also seeks a declaratory judgment of the parties' contractual rights and obligations (Count III). The gist of Heartland's counterclaim is that plaintiffs purportedly induced Chevron to breach the Heartland/Chevron Agreement by transferring sales proceeds directly to plaintiffs and not through the middleman, Heartland. Heartland purportedly relied on the funds coming from Chevron as collateral for loans from Heartland's bank, Northview Bank & Trust ("Northview"). According to Heartland, Northview rescinded a $1.6 million commitment it had made to extend

Heartland's line of credit because of the "interference and unreliability of the Chevron collateral." (Response at 7.)

### 1. Tortious Interference with Contract

In order to establish tortious interference with contract, Heartland must prove: (1) the existence of a valid, enforceable contract between Heartland and a third party (here, Chevron); (2) plaintiffs/counter-defendants' (for convenience, we will continue to refer to them as "plaintiffs") knowledge of that contract; (3) plaintiffs' intentional and unjustified inducement of Chevron to breach the contract; (4) a subsequent breach by Chevron resulting from plaintiffs' wrongful conduct; and (5) damages suffered by Heartland as a result of the breach. See Grund v. Donegan, 700 N.E.2d 157, 160 (Ill. App. Ct. 1998). Plaintiffs contend that Heartland has not demonstrated a genuine issue of material fact as to the third, fourth, and fifth elements of this claim. We agree as to the third and fifth elements.

The Heartland/Chevron Agreement contains the following provision: "Chevron shall make payment on properly submitted invoices within twenty (20) calendar days after the end of the month in which they are submitted, less agreed upon commission. Upon written request by [Heartland], Chevron shall pay [Heartland] by electronic funds transfer." (Plaintiffs' Local Rule 56.1 Statement, Ex. 7, Heartland/Chevron Agreement, at 5.) Evidently, this is the provision that Heartland contends was breached by

Chevron, although Heartland does not provide a quotation of, or a citation to, a specific contractual provision.

Heartland has submitted evidence showing that plaintiffs induced Chevron to send money directly to plaintiffs instead of paying through Heartland, and that Chevron then bypassed Heartland (although, when Heartland protested, Chevron did re-direct the payments through Heartland). However, Heartland has not demonstrated a genuine issue of material fact that plaintiffs' inducement of Chevron was intentional and unjustified, as required by Illinois law. "[I]ll-will alone is not enough to establish lack of 'justification'; there must be a desire to harm, which is independent of and unrelated to a desire to protect the acting party's rights and which is not reasonably related to the defense of a recognized property or social interest." <u>Village of Lake Barrington v. Hogan</u>, 649 N.E.2d 1366, 1374 (Ill. App. Ct. 1995). It is clear from the evidence that plaintiffs' conduct stemmed from economic self-interest: their desire to receive the sales proceeds to which they were entitled. Heartland submits no evidence indicating that plaintiffs had an independent desire to harm Heartland.

In addition, Heartland submits no evidence indicating that it suffered damages as a result of any breach by Chevron. Heartland claims that its bank, Northview, "pulled the plug" on a pre-approved additional credit line in November and December 2001

because Northview "determined that the Heartland security interest in Chevron funds was unreliable." (Response at 10.) On this issue, plaintiffs submit the affidavit of James Briggs, formerly an Executive Vice President of Northview.[6] Mr. Briggs states that for over seven years, he was the Northview employee principally responsible for determining whether Heartland and its related businesses were extended credit and offered loans. Mr. Briggs also states as follows:

> 7. The transfer or failure to transfer funds by [Chevron] into bank accounts controlled by [Heartland and its related businesses], in 2001 and 2002, did not in any way influence [Northview's] decisions of whether or not to extend credit or loan funds to [Heartland and its related businesses].
> 8. At no time while I was employed at [Northview] did [Northview] ever consider the balance of the Heartland account to which Chevron made wire transfers in deciding whether to extend credit or loan funds to [Heartland and its related businesses].
> . . .
> 10. The sole reason [Northview] declined to loan [Heartland and its related businesses] funds in 2001 and 2002 was that they: (1) were fully leveraged; and (2) [Heartland's president, Charles Rey] failed to provide [Northview] with updated financial information requested by [Northview] including tax returns for [Heartland and its related businesses].

(Plaintiffs' Local Rule 56.1 Statement, Ex. 13, Affidavit of James Briggs.)

Heartland attempts to controvert Mr. Briggs's affidavit with the affidavit of Blair Robinson, President of Northview. Mr. Robinson states that he directly supervised Mr. Briggs and that Mr.

---

[6] Mr. Briggs indicates that he retired from that employment in December 2002.

Briggs was "assigned to make preliminary determinations" as to whether Heartland should be extended credit and offered loans. Mr. Robinson further states:

> 4. . . . Since the credit sought by [Heartland and its related businesses] was beyond the authority of Mr. Briggs, it was necessary for him to submit all requests for credit with his recommendations to the Internal Loan Committee and thereafter to the Director's Loan Committee for approval. I am and have been a member of both those committees since 1993 and my veto of any request for extension of credit at a committee vote prevents any credit from being granted;
>
> . . .
>
> 7. [A]s of November 30, 2001, an expected payment in excess of $900,000 was not made by Chevron. . . . While those funds were eventually submitted in December 2001 after several discussions were had between Messrs. Rey and Briggs and various employees at Chevron, [Northview] would have considered the Chevron receivables unreliable collateral for further lending because of this payment stoppage;
>
> 8. When Chevron again withheld its expected payment of $618,832.08 in late December 2001, that action reinforced [Northview's] original concern that the Chevron receivables had become unreliable collateral.
>
> 9. Since [Northview] could no longer count on the Chevron payments as collateral, [Northview] could not extend further credit to [Heartland and its related businesses] based upon the Chevron receivables as collateral;
>
> 10. I have reviewed the . . . affidavit of Mr. Briggs submitted in this case and can state that the failure of Chevron to transfer funds to [Northview] would have had a significant influence upon [Northview's] decision to deny credit thereafter to [Heartland and its related businesses].

(Defendant's Local Rule 56.1 Statement, Ex. 5, Affidavit of Blair Robinson (citations omitted).) Mr. Robinson's affidavit is notable for what it does not say. Mr. Robinson does not state that he was personally involved with the denial of credit to Heartland, that he

reviewed Mr. Briggs's decision, or that he even would have reviewed a decision to <u>deny</u> credit as opposed to <u>approving</u> credit. He also does not state that Chevron's failure to transfer funds <u>did</u> play a role in Northview's decision, only that he believes it "would have." These statements are not sufficient to properly controvert those of Mr. Briggs. Accordingly, the evidence that Chevron's failure to transfer funds to Heartland did not affect Northview's decision to deny Heartland credit is uncontradicted.

Because Heartland has failed to show a genuine issue of material fact as to the third and fifth elements of its tortious interference with contract claim, summary judgment for plaintiffs is appropriate.

### 2. Tortious Interference with Prospective Economic Advantage

Heartland must prove the following elements of a claim for tortious interference with prospective economic advantage: (1) Heartland's reasonable expectation of a valid business relationship or economic advantage; (2) plaintiffs' knowledge of the expectancy; (3) intentional interference by the plaintiffs that defeated the expectancy; and (4) damages to Heartland resulting from the interference. See <u>Douglas Theater Corp. v. Chicago Title & Trust Co.</u>, 641 N.E.2d 584, 590 (Ill. App. Ct. 1994). It appears that Heartland contends that plaintiffs interfered with Heartland's prospective relationships with both Chevron and Northview.

Plaintiffs argue that Heartland has failed to demonstrate a genuine issue of material fact as to either.

### a. **Northview**

Heartland claims that plaintiffs interfered with Heartland's expectation to receive an additional $1.6 million of credit from Northview. Heartland, however, fails to offer any evidence showing that plaintiffs knew of this supposed expectancy. Moreover, Heartland repeatedly maintains that it had pre-approval for this additional line of credit, but does not present any evidence of this pre-approval. Statements regarding Heartland's "creditworthiness" have nothing to do with whether it was actually pre-approved for additional credit. As to Northview, Heartland cannot show a genuine issue regarding the first and second elements of its claim.

### b. **Chevron**

Heartland claims that plaintiffs made disparaging remarks to Chevron about Heartland's financial viability and thereby damaged Heartland's relationship with Chevron. Heartland has failed to produce any admissible evidence of disparaging remarks, though, or even any particular remarks. Heartland cites the deposition of its president, Charles Rey, who testified that two Chevron employees had told him that plaintiffs made statements to Chevron "questioning [Heartland's] financial health." (Defendant's Local Rule 56.1 Statement, Ex. 1, Transcript of Deposition of Charles

Rey, at 292.) Plaintiffs argue that "Rey's recitation of what Chevron told him that Plaintiffs told Chevron is double hearsay that is inadmissible to prove the truth of what [plaintiffs] allegedly told Chevron." (Reply at 8-9.) We agree.

To the extent that Heartland's claim is based not on "disparaging remarks" but merely on the fact of plaintiffs' inducement of Chevron to pay them directly instead of through Heartland, our reasoning _supra_ section B.1 applies. There is no evidence that these actions were intentional or unjustified.

Summary judgment for plaintiffs is appropriate on Count II.

### 3. **Declaratory Judgment**

Heartland's prayer for relief in Count III of the counterclaim is extremely vague: "Heartland Direct, Inc. prays that this Court declare the rights and obligations of the parties pursuant to the various agreements entered into by the parties, to declare the extent of entitlement to the funds in question and to declare the liabilities of the parties under any agreements that may exist." (Answer/Counterclaim at 21.) In its brief, Heartland does not clarify what it is seeking in particular, simply stating that it "seeks a declaratory judgment regarding the rights and obligations of the parties under their agreements." (Response at 14.)

Where a controversy has ripened and a substantive suit would resolve the issues raised by the declaratory judgment action, a declaratory judgment action serves no useful purpose. _See Cooper_

v. Durham School Servs., No. 03 C 2431, 2003 WL 22232833, at *6
(N.D. Ill. Sept. 22, 2003). Here, plaintiffs' breach of contract
claim is the substantive claim addressing the parties' rights and
obligations under the agreement. Heartland's declaratory judgment
claim therefore is superfluous and must be dismissed.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary
judgment as to liability on Counts I and II of the complaint is
granted as to Count I and denied as to Count II as moot.

Plaintiffs' motion for summary judgment on defendant's
counterclaim is granted in part, as to Counts I and II of the
counterclaim. Count III of the counterclaim is dismissed with
prejudice.

This case is set for a status conference on March 31, 2004, at
11:00 a.m.


DATE:      March 15, 2004


ENTER:     _____

           John F. Grady, United States District Judge